```
                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
                            WACO DIVISION


WSOU INVESTMENTS, LLC,      .   Case Nos. 6:20-CV-00473-ADA-DTG
                            .             6:20-CV-00475-ADA-DTG
            Plaintiff,      .             6:20-CV-00476-ADA-DTG
                            .             6:20-CV-00477-ADA-DTG
                            .             6:20-CV-00480-ADA-DTG
       v.                   .             6:20-CV-00481-ADA-DTG
                            .             6:20-CV-00482-ADA-DTG
DELL TECHNOLOGIES, INC.,    .             6:20-CV-00485-ADA-DTG
et al.,                     .             6:20-CV-00486-ADA-DTG
                            .
                            .   **VIA ZOOM TELECONFERENCE**
                            .
            Defendants.     .   Wednesday, April 13, 2022
. . . . . . . . . . . . . . .   2:31 p.m.




                  TRANSCRIPT OF DISCOVERY HEARING
               BEFORE HONORABLE DEREK T. GILLILAND
                UNITED STATES MAGISTRATE JUDGE



APPEARANCES VIA ZOOM TELECONFERENCE:

For the Plaintiff:          Steckler Wayne Cherry & Love
                            By:  MARK D. SIEGMUND, ESQ.
                            8416 Old McGregor Road
                            Waco, Texas 76712

                            Kasowitz Benson & Torres, LLP
                            BY:  HEATHER S. KIM, ESQ.
                                 DARCY L. JONES, ESQ.
                            333 Twin Dolphin Drive, Suite 200
                            Redwood Shores, California 94065

                            Kasowitz Benson & Torres, LLP
                            BY:  SHELLEY IVAN, ESQ.
                            1633 Broadway
                            New York, New York 10019



APPEARANCES CONTINUED ON NEXT PAGE.



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

2

APPEARANCES VIA ZOOM TELECONFERENCE (CONTINUED):

For the Defendants:          Gibson, Dunn & Crutcher LLP
                             BY:  BENJAMIN HERSHKOWITZ, ESQ.
                                  ALLEN KATHIR, ESQ.
                             200 Park Avenue 47
                             New York, New York 10166

                             Gibson, Dunn & Crutcher LLP
                             BY:  JAYSEN S. CHUNG, ESQ.
                             555 Mission Street, Suite 3000
                             San Francisco, California 94105

                             Gibson, Dunn & Crutcher LLP
                             BY:  NATHANIEL R. SCHARN, ESQ.
                             3161 Michelson Drive
                             Irvine, California 92612

                             Winston & Strawn
                             BY:  BARRY K. SHELTON, ESQ.
                             2121 North Pearl Street, Suite 900
                             Dallas, Texas 75201


Deputy Clerk:                Melissa Copp
                             U.S. District Court
                             800 Franklin Avenue, #140
                             Waco, Texas 76701


Transcription Company:       Liberty Transcripts
                             7306 Danwood Drive
                             Austin, Texas 78759
                             (847) 848-4907
                             www.libertytranscripts.com

<u>INDEX</u>

                                                        PAGE

Case called                                               4

Court Rulings on Discovery Disputes                      32
                                                         59
                                                         68
                                                         71
                                                         77


End of Proceedings                                       84

Certificate of Transcriber                               84

**WWW.LIBERTYTRANSCRIPTS.COM**

1       WACO, TEXAS, WEDNESDAY, APRIL 13, 2022, 2:31 P.M.

2              THE COURT:  Okay.  Welcome everybody.  It's good to

3  see everybody.

4              Ms. Copp, will you please call the case?

5              THE CLERK:  Yes, Your Honor.

6              Calling Case Number WA:20-CV-473, 475, 476, 477, 480,

7  481, 482, 485, and 486, styled WSOU Investments, LLC, Doing

8  Business As Brazos Licensing and Development v. Dell

9  Technologies, Inc., *et al.*, called for a discovery hearing.

10             THE COURT:  Okay.  And I understand we're here on

11 several discovery disputes.  I would like to make a preliminary

12 reminder for everybody.  We're operating without a live court

13 reporter, so it will be important that you please introduce

14 yourself somewhat like you would on a conference call each time

15 you start speaking, and make sure to speak clearly into your

16 microphone.  And if for some reason it's hard to hear you, I'll

17 ask you to speak up.

18             Could I get announcements from plaintiff, please,

19 starting with the plaintiff?

20             MR. SIEGMUND:  Good afternoon, Your Honor.  This is

21 Mark Siegmund with Steckler Wayne Cherry & Love on behalf of

22 Brazos Licensing and Development.  With me this afternoon are

23 my colleagues, Heather Kim, Shelley Ivan, and Darcy Jones.  Ms.

24 Kim and Ms. Ivan will be the main speakers today, Your Honor.

25 And we are ready to proceed.

1          THE COURT:  Very good.  Welcome.

2          And could I get announcements from Defendants?  I

3   know we have several, so I see Mr. Shelton in the top left of

4   my screen so let's start with Mr. Shelton.

5          MR. SHELTON:  Thank you, Your Honor.  And

6   congratulations on your appointment, and it's my pleasure to

7   appear before you for the first time.  Barry Shelton of Winston

8   & Strawn, LLP.  I'm local counsel for defendants, and I'd like

9   to introduce most importantly our client representatives.  We

10  have Britta Haskell from the Dell defendants, Danielle Coleman,

11  and Rachel Chen from VMware.

12          Also my colleagues from Gibson Dunn & Crutcher,

13  Benjamin Hershkowitz, Allen Kathir, Jaysen Chung, and Nathaniel

14  Scharn.  And Mr. Hershkowitz will be arguing for the

15  defendants.  Thank you, Your Honor.

16          THE COURT:  Very good.  Welcome everybody and

17  especially to the client representatives who are taking their

18  time to attend the proceedings.  The discovery dispute hearings

19  are not the most exciting part of any case, but I'd say they

20  are a very important part.  So I'm glad you're here.

21          And with that, I guess I'm looking at I believe it's

22  Dispute Chart Number 1 regarding reasonably similar products.

23  I believe it's the plaintiff's -- or the movant, so to speak.

24  So why don't we start with argument from the plaintiffs on the

25  issue of reasonably similar products.

1          MS. KIM:  Good afternoon, Your Honor.  Heather Kim

2  from Kasowitz Benson Torres on behalf of plaintiff.

3          First of all, Your Honor, I didn't know if you have

4  any questions off the bat that I may answer for you with

5  respect to this particular dispute.

6          THE COURT:  Not right off the bat.  Why don't you lay

7  out your argument since you've seen both -- I've seen both

8  parties' positions and read those, so.

9          MS. KIM:  Okay.  Thank you, Your Honor.

10          In addition to what's been set forth in our briefing,

11  in response to some of the positions that defendants have

12  taken, we'd like to just take those up one by one.  First off,

13  Your Honor, the products that we are seeking the discovery on

14  were accused the whole time.  We have not removed them.  They

15  are still in our complaint to this date.

16          Defendants also say that the hardware has not been

17  accused in our final infringement contentions.  That is also

18  not true, Your Honor.  We can go ahead and cite to portions of

19  our final infringement contentions that have those.  Notably,

20  one of them that sticks out in my mind is Figure 8.  And it is

21  on defendants to let us know really if the software is accused,

22  software doesn't just run by itself alone somewhere.  It does

23  normally go with hardware products, as well.  I'm not super

24  tech savvy, but that's something that I can reasonably

25  understand.

1          A second decision is that we had asked them -- and
2    this kind of goes with our I think it's Issue Number 3 on
3    request to supplement their response to our Interrogatory
4    Number 1 to include information on these other reasonably
5    similar products.

6          But with that in mind, Your Honor, we did ask them in
7    an interrogatory to set forth all products, all devices that
8    have the accused functionality.  They have refused and failed
9    to identify all products which are the products that we're
10   fighting about here today in front of Your Court.

11         A third point that I'd like to raise with you, Your
12   Honor, is that they have only given us -- they've given us
13   productions as recently as late February.  And so we had been
14   combing through all the documents that they've given us, which
15   they I think enumerate in the chart right below this one.  They
16   note a bunch of documents, how many there are, and, you know,
17   hundreds of thousands of pages.  So we've been sorting through
18   all of that.

19         And when we saw that documents with respect to the
20   products that are identified in our Exhibit 1 to the attached
21   dispute chart here, they were missing, we went and we asked
22   them when we raised this issue with them in February as well,
23   Your Honor.  And that is when they told us that, you know, we
24   are in an impasse.  We're not going to give you discovery on
25   these products.

1           And with that, Your Honor, I don't know if you have

2     any other questions or if you'd like to hear anything further

3     from me.

4           THE COURT:  Well, I am curious can you point me to

5     the specific exhibit?  I think we've got the zip file full of

6     exhibits.

7           MS. KIM:  Mm hmm.

8           THE COURT:  Which one identifies the what you've

9     termed reasonably similar products?

10          MS. KIM:  It's going to be the Word document.  I

11    believe that one is titled "Exhibit 1-Chart of Reasonably

12    Similar Products."  Do you see that on your end, Your Honor?

13          THE COURT:  I do.  I do.  Okay.

14          MS. KIM:  That's the one, Your Honor.

15          THE COURT:  That's what I was -- I thought that would

16    be what you're referring to.  Was this Exhibit 1, was it

17    included or part of infringement contentions?

18          MS. KIM:  It was not a part of our infringement

19    contentions, Your Honor.  No.

20          THE COURT:  Okay.  And what in the infringement

21    contentions would have identified these reasonably similar

22    products?

23          MS. KIM:  They would have been in our complaint.  I

24    believe they are also in our preliminary and our final

25    infringement contentions.  And it wouldn't be every single one,

1  for example, I don't believe of these specific models that we

2  have here.  But we do allege and accused, for example, the

3  PowerEdge servers.

4          THE COURT:  Okay.  So it -- and just so I make sure I

5  follow you correctly then, what I am referring to as Exhibit 1,

6  the Word document that you provided to us, that specifically

7  was not part of the infringement contentions but the products

8  that are identified in this Word document Exhibit 1 were

9  referenced in the complaint, preliminary, and infringement

10  contentions?

11          MS. KIM:  Correct, Your Honor.  The three -- the

12  broad categories that you see there.  Yes, Your Honor.

13          THE COURT:  Okay.  And the broad categories, is that

14  like the left-hand column?

15          MS. KIM:  Yes, Your Honor.

16          THE COURT:  Okay.  Okay.

17          Okay.  Let me hear a response from -- I believe, Mr.

18  Hershkowitz, are you going to be speaking?

19          MR. HERSHKOWITZ:  I will, Your Honor, and thank you.

20  And, again, welcome to the bench and welcome to this show.  I'm

21  hoping that you will not get tired of my voice by the end of

22  this since I'll be handling all the arguments.  And I'm also

23  hoping that about half of these arguments should have been

24  mooted by recent productions, et cetera.  But, unfortunately,

25  this is not one of them.

 1          So let me dive in and address what Ms. Kim said
 2  initially, and then I'll go back and talk about some other
 3  things.  So, number one, with respect to her statement on
 4  documents, 98 percent of the documents that had been produced
 5  were done pre-November of last year.  And the reason was we
 6  were supposed to have a close of discovery in December.
 7          At the time, another law firm who is representing
 8  plaintiff reached out to us.  The parties agreed on an
 9  extension at that time and extended discovery.  So we were
10  already basically done because discovery was supposed to have
11  been ending within a month, approximately, of when that
12  extension got put into place.
13          So as to going through additional documents and
14  everything else, two percent more has been produced since that
15  time.  When they asked us to go back and look for documents --
16  and these are some of the later issues -- we did.  We found a
17  few other things that simply got missed in our first
18  proportional reasonable searches of what was going on, and that
19  information was produced.
20          But that's not the issue that's here.  The issue
21  that's here is the issue of whether or not we can put the cart,
22  as they are trying to do, before the horse.  Specifically
23  Judge, the contentions are supposed to define the metes and
24  bounds of what they believe is infringing.  And it's very
25  interesting the phraseology that they're using which is

1  reasonably similar to those identified by WSOU.

2          But what's also interesting is they didn't bother to
3  submit those contentions.  There's a reason why.  Because they
4  simply did not chart any of the products -- and I'm going to
5  break this down into two things.  There are two of the patents,
6  the '800 and the '133, where the accused functionality is in
7  software made by and provided by VMware.  And I'll address the
8  Dell patent separately.  But let me start there.

9          And they go through limitation by limitation and
10 identify what they allege is accused, what they allege, Judge,
11 is software.  There's no dispute that software has to run on
12 hardware.  There's also no dispute you have to plug in the
13 hardware and get electricity which has to be generated by the
14 power station, et cetera.  But there's a logical definition of
15 what is at issue.  And they defined it, that logical definition
16 is the software.

17          And, yes, Ms. Kim is referring back to the complaint.
18 But the complaint was superseded by their contentions.  And the
19 OGP is clear.  Preliminary contentions set forth where in the
20 accused products each element of the asserted claims are found.
21 They pointed to software.  There's no dispute the software runs
22 on hardware.

23          The question is why do they need any of that
24 information and why should we have to provide that information
25 where what they've accused and what they have said meets the

1  limitations of their claims is software.  And, in fact, when we
2  look at this, we can see if you go to the contentions, which
3  unfortunately you don't have -- they did not provide them to
4  you -- they define the scope of those accused products.

5      Nowhere do I hear them coming forth and saying the
6  hardware operates the same way as the software.  What they're
7  saying is the software runs on hardware.  And they've
8  identified -- for the first two patents, they've identified
9  hardware that has been publicly known, it's out there.  You can
10 find it by googling what that hardware is.  It's long been out
11 there.  So these are not newly developed products.  These are
12 not products that were kept hidden from them, as Ms. Kim
13 indicated.

14     They had identified a broad category in their
15 complaint but they never ever pursued that in their
16 contentions.  And I don't think you will hear plaintiffs say
17 that they're saying that the hardware products operate the same
18 as the software products.  I think what you're going to hear
19 them say is the software products run on hardware products.

20     No dispute software runs on hardware, Judge.  The
21 question is why do they need that.  And we did provide them
22 with other information, financial-related information beyond
23 just the software.  So it can't be that either.

24     And so they defined what it is that they said was
25 infringing, and that's software for the -- what I'll call the

1  '800 patent which is one of the three that are identified.  It

2  is on the Exhibit 1.  You'll see it's the middle one, the Dell

3  PowerEdge servers is what they're now doing.  They've got this

4  litany of products which they can nowhere point to in their

5  contentions.

6          And as a matter of fact, if you look at the cover

7  page of their contentions -- I shouldn't say the cover page --

8  the first page of those two contentions that they have as to

9  the '800 patent and the '133 patent, it says as follows:

10 "Certain contentions in the chart below are described with a

11 reference to the exemplary product vSphere by VMware, Inc."

12 They then say the exact same thing except with respect to

13 VeloCloud and what they say SD-WAN by VMware where they then

14 acknowledge that SD-WAN stands for Software-Defined WAN, in

15 other words, the software.

16         All of the documents that they are pointing to in

17 their final contentions -- eight exhibits for one, four

18 exhibits for the other -- are all VMware software, guides, and

19 products, et cetera.  So in short, the hardware for those

20 products are simply not in the case.

21         And as to their interrogatory which is Issue 3, but

22 since Ms. Kim raised it, I'd like to address it, too.  We told

23 them right off the bat, we said to them in there, we said:

24 "Defendants will respond to this interrogatory and only with

25 respect to what they understand to be the subject to WSOU's

1   infringement contentions."

2            This is back the middle of last year, Judge.  We

3   wrote to them when they raised this dispute for the first time,

4   and we said tell us what it is that you think is infringed

5   that's beyond your contentions and why.  They categorically

6   refused to do so.  We wrote them letters, Judge, back in 2000

7   when they first gave us their original preliminary infringement

8   contentions, and we said please provide a complete list by

9   model number or name of the accused products for each patent.

10  And we told them in that letter that we understood it to be the

11  software that (indiscernible).  They never did so.

12            So this is them attempting to completely shift the

13  burden that the OGP places on them to identify the products and

14  services that they believe are accused and meet the limitations

15  of their claims.  And they shouldn't be seen to try to shift

16  that burden to us.  These are not, quote/unquote, reasonably

17  similar products to those identified in their contentions.

18            Turning now -- well, let me pause there for a minute,

19  Judge, and then I'll turn to the third patent which is one

20  that's asserted only against Dell.

21            THE COURT:  Go ahead.

22            MR. HERSHKOWITZ:  Thank you, Your Honor.

23            And so with respect to that, this last patent they

24  accuse the Smart OS10 software.  And here, Judge, we have a

25  little bit of a different situation.  We all know that OS runs

1 on hardware.  And as a matter of fact, it is the operating

2 system for a number of products that are listed in that Exhibit

3 1.  There's no dispute about that.  It absolutely is.

4          However, what they also know is that the only thing

5 the software does is make calls out to a chip, a chip made by

6 Broadcom.  And for the chip made by Broadcom, they actually

7 have sought and were successful in getting Judge Albright to

8 give them permission -- despite the parties' agreement that no

9 new discovery would be taken, to get permission to seek that

10 discovery from Broadcom.

11          The rest of the hardware, Judge, no question that it

12 is not relevant to what we are going on -- or to what is going

13 on.  They don't identify it as such when you go through their

14 contentions.  All they really do is focus on the OS and now

15 they're going to be focusing on the chip.

16          And so we also gave them, Judge, the financial

17 information about those hardware products.  Why?  Because we

18 know that hardware only -- software only runs on hardware, and

19 because it's an operating system, it's not a separately priced

20 item.  And so we gave them the financial information for the

21 very product.  In fact, their list appears to come from the

22 financial document that we provided to them.

23          So it's not a question that they need this for

24 financial purposes.  This is them once again not explaining

25 anywhere how the accused software is reasonably similar now to

1   the hardware they're seeking or why that hardware is even

2   remotely relevant to what's going on.  You know, they're not

3   explaining why they products are similar, and in no way

4   notified us in their contentions as to why they believed that

5   that hardware is at issue.

6           So, Judge, let me pause there and see if you have any

7   questions.  If not, I'm sure plaintiff will have a response.

8           THE COURT:  Okay.  Let me ask you just to make sure

9   I'm following you real quick.  So I'm looking at the Word

10  document titled "Exhibit 1."

11          MR. HERSHKOWITZ:  Yes.

12          THE COURT:  And it was in the zip file under folder

13  "Chart 1 Exhibit 1 Chart of Reasonably Similar Products."  And

14  so the last part that you're referring to, the software, the

15  OS10, I assume that's the Smart Fabric Operating System 10 that

16  relates to the '144 patent?

17          MR. HERSHKOWITZ:  It does, Your Honor.

18          And I should also mention that I believe Ms. Kim made

19  a misstatement because I don't believe that they had identified

20  broad categories of hardware in their complaint.  And so I just

21  wanted to make that point as I'm looking because I had a note

22  next to it.

23          So if you're looking at that Exhibit 1, Your Honor,

24  so the '800 patent was asserted against VMware software.  The

25  '133 patent at the top was asserted against VMware software.

1  And at the bottom, the '144 patent was asserted against that

2  Smart Fabric Operating System software.

3         And they're now seeking discovery with respect to the

4  chip because they learned through looking at the software that,

5  in fact, all the software does is make calls to the chip.  And

6  so the functionality that they're seeking is not within our

7  possession and control, but that of a third party, Broadcom,

8  whose chip is included in the products.

9         THE COURT:  Okay.  And so back to the chart, the

10  Smart Fabric Operating System 10, I guess the dispute -- at

11  least I'm trying to get this into more manageable sizes for

12  myself.  The dispute as I understand it with regard to the '144

13  patent, then, is whether or not you need to provide documents

14  regarding the hardware that's listed in that right-hand column

15  under devices On Which Sun Fabric OS10 runs?

16         MR. HERSHKOWITZ:  That is my understanding, Your

17  Honor.

18         THE COURT:  Okay.  And Dell is the party against whom

19  this patent is asserted?

20         MR. HERSHKOWITZ:  Correct.  So just to be clear, Your

21  Honor, is originally, there were 12 patents, 8 of which were

22  only asserted against Dell.  Three of those have been dropped,

23  and a fourth the parties attempted to drop but I think we

24  somehow made a mistake in our filing.  And so the fourth patent

25  will be dropped.

1            So there are now four patents against Dell only, and

2      there are four patents where VMware is accused along with Dell

3      but really the accusations are directed to VMware's software in

4      those cases.  And two of those cases are the '133 and the '800

5      patent that are there.

6            THE COURT:  Okay.  And we'll get -- we'll back up on

7      to those just taking it a step at a time for myself.

8            So if I understand you correctly, then, Dell has

9      produced the financial data related to the products under Smart

10     Fabric OS10 in the bottom of Exhibit 1 but has not produced the

11     technical documents related to those hardware products?

12            MR. HERSHKOWITZ:  We produced information about the

13     hardware to the extent that it's clear which -- what platform

14     the software is running on, which are the products listed, with

15     one caveat, Judge.  ESXi Host is actually a piece of software

16     that's involved with the OS10 operating system.  So I believe

17     that that's simply a misunderstanding on behalf of plaintiff.

18            THE COURT:  Okay.  And then so has the ESXi Host

19     software, the information regarding it, has it been produced or

20     is it at issue in this dispute, as well?

21            MR. HERSHKOWITZ:  I'm not aware that it should be at

22     issue at all in this dispute, Judge, but I don't have that

23     exact data point at my fingertips.

24            THE COURT:  Okay.

25            And, Ms. Kim, let me ask you just sticking with that

1   last chart on Exhibit 1.  So are those products under Sun

2   Fabrics OS10, the right-hand column, are those the products

3   with regard to the '144 patent where you want more documents

4   concerning that hardware?

5          MS. KIM:  That's correct, Your Honor.

6          THE COURT:  Okay.  And so that -- at least with

7   regard to the '144 patent, that's what we're going to call the

8   reasonably similar products for purposes of today, at least?

9          MS. KIM:  Correct, Your Honor.

10          THE COURT:  And can you respond to Mr. Hershkowitz's

11   statement that it is a software patent, so explain to me why

12   you need hardware-related documents.

13          MS. KIM:  Yes, Your Honor.

14          I think there is no dispute, as Mr. Hershkowitz's

15   confirmed, that the software runs on the hardware.  And there

16   is going to be, I would imagine not being a very tech-savvy

17   person, a relationship of how the hardware is implementing the

18   software code and the relationship between those things.

19          And so with that respect, Your Honor, we are looking

20   for technical documentation on that.  I also didn't hear Mr.

21   Hershkowitz dispute that the accused functionality is running

22   on the hardware that we have identified in our Exhibit 1 chart,

23   as well.  So there's no dispute really that the software, the

24   SmartFabric in the '144 patent case is running on the switches

25   that we've identified in that chart.  And I don't think there's

1 a dispute that there is a relationship between the software and

2 the hardware to figure out exactly how it's being implemented.

3          THE COURT:  And just sticking with this OS10 in that

4 bottom table, was there ever a specific request made for

5 documents related to the hardware?

6          MS. KIM:  I believe so, Your Honor.  I think that was

7 sent out in February of this year.

8          And I do want to note for Your Honor I understand

9 that they had produced 98 percent of their documents last year.

10 I checked with my team and I believe 35,000 pages were produced

11 since we came into the case around Christmas.  So that would

12 have been their February productions.

13          THE COURT:  Okay.  And then let's back up to the

14 first table on Exhibit 1, the Dell EMC SD-WAN Edge, and the

15 '133 patent.  And do you agree with Mr. Hershkowitz that that

16 '133 patent is, generally speaking, asserted against software

17 made by VMware?

18          MS. KIM:  I believe both that one and the one

19 underneath -- so this is the EMC SD-WAN Edge servers as well as

20 the Dell PowerEdge servers.  They contain the Verosphere, I

21 believe it's called, and that's the accused software

22 functionality.

23          And in Defendants' chart, actually, they provide a

24 citation saying that their original complaint for the '133

25 patent identified the Dell EMC SD-WAN Edge 600 Series product

1  which is the software that is shown in the right-hand column of

2  that first chart, Your Honor.

3           THE COURT:  Okay.

4           MS. KIM:  So we did identify that.

5           THE COURT:  I'm sorry.  Go ahead.

6           MS. KIM:  So we did identify that, the hardware.

7           THE COURT:  Okay.  And so the -- I guess for the '133

8  and the '800, the reasonably similar product's hardware that

9  we're talking about, then, is going to be the right-hand

10 columns of those two middle charts on Exhibit 1?

11          MS. KIM:  Correct, Your Honor.

12          Yeah.  I think they were like -- so it's the product

13 category that you see on the very left, and then there are the

14 number or sort of rack or tower series, and then there's like

15 the subseries that you see in the far right side.  So we broke

16 it down the best we could.

17          THE COURT:  Okay.  And how -- again, same question

18 that we had with regard to OS10.  How is the production of

19 technical documents or documents related to hardware necessary

20 for the infringement read on -- that reads on software?

21          MS. KIM:  Yes, Your Honor.

22          I think similarly to the '144 patent for SmartFabric,

23 there is a relationship between hardware and software.  And in

24 (indiscernible) experience or at least my experience in

25 litigating patent cases so far, even when, for example, it's a

1 Broadcom chip that's going to be implementing certain

2 functionalities of the accused technology, there is still

3 sometimes, in my experience at least, where the defendant is

4 actually going in and working sometimes with that third-party

5 chip manufacturer such as Broadcom to have specific

6 requirements to be putting into their product so that they

7 actually do work with the hardware that they sell.

8          And I do want to note, Your Honor, that defendants

9 only recently as in yesterday produced financials for VMware

10 which encapsulates 50 percent of the cases at this time.

11          THE COURT:  Fifty --

12          MS. KIM:  So we just got the financials.

13          THE COURT:  Fifty percent --

14          MS. KIM:  Yeah, four out of the eight cases are

15 against VMware.  And we just got --

16          THE COURT:  Oh, okay.

17          MS. KIM:  -- the financials yesterday.

18          THE COURT:  Gotcha.  I caught you.  I wasn't sure

19 what 50 percent of the cases specifically meant.

20          MS. KIM:  Sorry.

21          THE COURT:  That's okay.

22          MS. KIM:  I'm horrible at math, but hopefully four

23 out of eight is 50 percent.

24          THE COURT:  Okay.  Okay.

25          MR. HERSHKOWITZ:  Judge, if I could take just two

1  seconds to respond?

2         THE COURT:  Absolutely.

3         MR. HERSHKOWITZ:  So, again, you said to introduce.

4  So it's Benjamin Hershkowitz so that we've got the record

5  straight, although I think Ms. Kim and my voice are different

6  enough that we shouldn't have any confusion on the record.

7         But just very very quickly.  There's just some things

8  that are just wrong.  If we go back to the two VMware --

9  patents asserted against VMware, it's really all about the

10  software.  Every claim, every limitation, what they are

11  pointing to is software.  There's no question that software has

12  to run on hardware.

13         But under Ms. Kim's theory, you could never sue a

14  software company without separately suing a hardware company,

15  even if all the functionality that's being accused is contained

16  in software.  That's the situation here.  It's all about the

17  software.

18         You don't hear Ms. Kim saying otherwise accept in

19  terms of platitudes about how software has to run on hardware.

20  No question.  But that's not what the functionality is about.

21         With respect to the '144, the Dell patent, again,

22  what we're talking about is guessing that maybe Dell was

23  working in partnership with Broadcom.  There's none of that

24  that's in the record, Your Honor.  It's a complete hypothetical

25  and speculation on behalf of Ms. Kim.

1          What we do know is that they have the code, the

2    SmartFabric operating system code in relevant part.  All that

3    does is make calls with respect to the Broadcom chip, and the

4    Broadcom chip is what they're now seeking discovery of.  The

5    rest of this is absolutely irrelevant.  It's that it's housed

6    in a piece of hardware, without question.  But that has nothing

7    to do with what their accusations in their infringement

8    contentions actually say and what it is.

9          All three of these are instances where what Ms. Kim

10   is looking for is the hardware on which software is being run

11   without any allegations anywhere in their contentions that

12   anything other than software is at issue.  They told us that.

13   The OGP put the burden on them to tell us.  And so this is not

14   a question of reasonably similar.

15         This is a question of expanding the case to hardware

16   items that have no bearing on what is going on here, with the

17   caveat that they're seeking information from Broadcom.  Why?

18   Because Dell simply does not have the information that they

19   need or that they want in connection with the chip, and the

20   functionality that they are accusing is on -- we understand to

21   be on the chip.

22         Thank you.

23         MS. KIM:  Your Honor, may I respond?

24         THE COURT:  Yes, ma'am. You may.

25         MS. KIM:  Thank you, Your Honor.

1        The Broadcom chip, just for Your Honor's knowledge,

2   is only with respect to the '800 patent, I believe.  So it's

3   not going to be the '133 patent.

4        Secondly, I just want to say, Your Honor, that our

5   charts, we do -- we did chart all representative products.

6   There's no question about that.  And I think this is the whole

7   point of discovery is we don't know the relationship of how the

8   hardware works with the software, and there is no dispute that

9   the hardware is related and reasonably similar.  I don't think

10  there's any dispute there.

11       We just need to know -- that's the purpose of

12  discovery is to figure out exactly how these things are working

13  together to carry out the accused functionality, Your Honor.

14       THE COURT:  And while we're on that subject, Ms. Kim,

15  can you identify for me for each of these patents, either one

16  of them or all of them -- ideally in all of them -- an area

17  where the claim element or the infringement contentions

18  reference hardware or -- you know, if you can give me an

19  example from each one --

20       MS. KIM:  Sure.

21       THE COURT:  -- to show me where they reference

22  hardware versus just referencing software, that would be

23  helpful.

24       MS. KIM:  You know, I can point you to them.  I don't

25  know if I can share my screen since this is a public hearing

1  and this is Dell's --

2         THE COURT:  I was going to warn you to be careful

3  about screen-sharing since this is --

4         MS. KIM:  Yeah.

5         THE COURT:  -- the public Zoom.

6         MS. KIM:  Okay.  Well, for example, I have a couple

7  of examples for you here.  This is for the '144 patent I'm

8  looking at.  Citation Number 8 we cite to the supported

9  platform being S6000-ON, S6010-ON, S6048 -- sorry, '4048T-ON,

10 S4100-OM Series.  Let me just make sure these are on here.  The

11 S-5200F-ON Series.

12        We also have on here, which is a Z Series this time,

13 the Z9100-ON Series, the Z9200-ON Series, and then a few more S

14 Series of S3000-ON, S4200-ON Series.  Another example is going

15 to be with respect to -- this one is the '133 patent.  And we

16 specifically referenced the Edge 500 LAN server.  And if you go

17 to your chart, Exhibit 1, Your Honor, that will be the very top

18 for Number 500.  That's the Series.

19        THE COURT:  Okay.

20        MS. KIM:  Did I answer your question?

21        THE COURT:  Well, I was really more curious on

22 whether there's specific claim elements that are going to

23 require you to point to hardware.  For example, you know, a

24 claim element that requires a motherboard -- I'm just plucking

25 that out of the air -- but a claim element referencing

1 hardware, if you have an example of that.

2          MS. KIM:  Sorry, let me see if I can pull that up.

3          Bear with me, Your Honor.  My computer can sometimes

4 be a little slow with all of my windows open.

5          THE COURT:  That's okay.

6          A second ago were you reading from your infringement

7 contentions or --

8          MS. KIM:  That was just some internal notes that I

9 had, Your Honor.

10          THE COURT:  Oh, okay.  I understand.

11          Well, let me ask you this a different way.  If you

12 don't get the hardware information regarding the documents or

13 the products in Exhibit 1, what harm is there to the plaintiff?

14          MS. KIM:  Your Honor, to the extent that there are

15 going to be -- and I'll have to take a look at the contentions

16 which I did not put together so I'm not readily familiar with.

17 But I can provide that to you at a different time as far as

18 citations go.

19          It's going to be prejudicial to us if we're missing

20 an element, for example, that requires a relationship between

21 the software that's accused and the hardware, which we wouldn't

22 have any transparency into without the discovery into it.

23          THE COURT:  Okay.

24          MS. KIM:  We also -- one other thing, Your Honor, on

25 the financials.  If we don't have the hardware, which is -- you

1  know, the software is sold with the hardware and we don't have

2  the hardware financials, then we don't have a basis for really

3  having a damages.

4         MR. HERSHKOWITZ:  Judge, if I could just briefly

5  respond to the couple of points with your permission?

6         THE COURT:  Sure.  Absolutely; go ahead.

7         MR. HERSHKOWITZ:  So, first, again, Ms. Kim got it

8  wrong.  The Broadcom is for the '144 patent.  There's nothing

9  that the Broadcom -- Broadcom has nothing to do with the two

10  patents that are asserted against VMware.  And so I just want

11  to make sure that that is clear on the record.

12         Second, with respect to financials, for the '144

13  patent, we did give the financials with respect to the hardware

14  product because the software is not a separately priced item.

15  So we gave the financials for that hardware product which

16  included the software.  Vmware is a separate company.  No

17  question that software has to run on hardware.

18         But if they take a look and Ms. Kim indicated we were

19  only able to get out the detailed financial report in the past

20  I think either 24 or 48 hours, it does include information with

21  respect to the hardware, too.  So this isn't a question into

22  one of their other topics with respect to financials.  So this

23  isn't about the financials.

24         And this topic that we're talking about now, and I

25  know it's gone on for a while, isn't about financials.  It is

1   about their contentions and what they put at issue.  And what

2   they have put at issue in the two patents against Vmware is

3   software, not hardware.  What they -- and they told us this.

4          So -- and with respect to the '144, what they put at

5   issue was Dell software.  We even asked them about it

6   repeatedly.  We said we understand it's the OS that is at

7   issue.  They never corrected that since 2020.  And only after

8   new counsel came in and after discovery was largely closed has

9   this become an issue because of a "FOMO," which is what we just

10  heard -- a fear of missing out on something.  But they defined

11  it this whole time.  And information about those products is

12  publicly available.  And yet, they did not detail a single

13  limitation as implicating or needing the hardware.

14         I'm not saying for the '144 patent they didn't

15  mention hardware.  What I'm saying, Judge, is that the only

16  piece of hardware that appears to be relevant at all is the

17  chip, and that chip they're now seeking information from from

18  Broadcom.  And we gave them the financial information about all

19  of those products.  So it's not like we withheld the number of

20  units or what the OS is installed on.  The only thing that they

21  have said so far that they've articulated that they needed was

22  information about the chip which we don't have and which they

23  are now seeking from Broadcom.

24         Thank you.

25         THE COURT:  Okay.  Let me do this.  Let's -- I'm

1    going to go off the record real quick and confer with my law

2    clerk.

3         (Off-the-record bench conference between Court and Law

4    Clerk from 3:07 p.m. to 3:10 p.m.)

5              THE COURT:  Okay.  A couple of quick questions.  When

6    are -- so I see fact discovery is set to cut off May 6th.

7              MR. HERSHKOWITZ:  Yes, Your Honor.

8              THE COURT:  And has that deadline already been pushed

9    once?

10             MR. HERSHKOWITZ:  That's correct, Your Honor.  The

11   parties entered a stipulation back in November of 2021 because

12   plaintiff was bringing in new counsel, Ms. Kim and her team.

13   And so the parties agreed at that time to an extension of the

14   schedule along with some other things to try to narrow the case

15   including dropping six patents and two tranches of three, as

16   well as what was supposed to be effectively closing discovery

17   except for some outstanding disputes and depositions.  But,

18   unfortunately, that part has not quite happened.

19             THE COURT:  And what about when are expert reports

20   due -- currently due in the case?

21             MR. HERSHKOWITZ:  My understanding is the first round

22   of reports is due at the end of May.  May 20 is the date

23   sticking, but please don't hold me to that.  And then roughly,

24   you know, four weeks later for responsive reports and then a

25   few weeks after that for the rest of expert discovery.

1          The judge has set, Your Honor, two trial dates.  The

2    first is in October, which is supposed to be on a first tranche

3    of the patents, we understand the patents that are only

4    asserted against Dell.  And then the second is set for

5    December, which are the patents that were asserted against

6    VMware.

7          THE COURT:  Okay.

8          And let me ask, Ms. Kim, does that sound right for

9    the expert report dates around the end of May?

10          MS. KIM:  Yes, Your Honor.

11          So the open reports, Mr. Hershkowitz is correct.

12   Heather Kim on behalf of plaintiff.  The opening reports are

13   May 20th.  The rebuttal reports are June 17th.  And the close

14   of expert discovery is currently July 8th.

15          THE COURT:  And as I understand it, at least with the

16   software information that you do have, you'll still be able to

17   prepare the reports.  Is that correct?  Or do you require this

18   hardware information to be able to do expert reports?

19          MS. KIM:  I imagine -- I have to defer to the more

20   technical members of my team, but I would imagine that we'd

21   need fulsome discovery in order to prepare our reports.

22   Otherwise, we would hopefully get them at some later time and

23   maybe seek leave to amend to fix our reports to the extent they

24   need to be fixed.

25          THE COURT:  I tell you the dilemma I'm struggling

1   with is I want to keep the case on track.  I generally have a

2   very broad view of discovery.  But this is an issue that's come

3   to us late in the case, as defendants have pointed out, coming

4   down to the wire on fact discovery and close to expert

5   discovery.

6         And so that kind of cuts against that, you know, my

7   general inclination to allow for broad discovery.  And at least

8   at this point, I haven't heard anything to make me think that

9   the plaintiff needs the hardware documents to prove specific

10  claim elements.  So in light of that and to try and keep this

11  case on track, I'm going to deny the request for the hardware

12  documents since I understand the software information and the

13  financial information has been provided.

14        So I think that -- so we'll deny Issue Number 1

15  regarding hardware on reasonably similar products.  And as I

16  said, that's in large part to do with the late stage of the

17  case and what I've seen.  I haven't seen any evidence to

18  indicate that the hardware is a required claim element.

19        MS. KIM:  Your Honor, may I speak just a couple of

20  clarification points as to ruling?

21        THE COURT:  You can.

22        MS. KIM:  First off, Your Honor, we still are missing

23  financials for the '133 patent and the '800 patent.  Dell

24  obviously makes their money by putting the AQS functionality or

25  the software on to the hardware and selling them.  So I want to

1  just get a clarification from Your Honor that your ruling is

2  not going to be affecting their obligation to give us

3  financials on the hardware that is containing the software.

4          THE COURT:  Yeah.  My understanding was I guess I was

5  thinking that they had already provided all of the financial

6  stuff.  If they haven't, since they've already provided some, I

7  expect them to provide the remainder, even as Mr. Hershkowitz

8  said, since these are not sold separately.  I would expect

9  those financial documents to be produced.

10         MR. HERSHKOWITZ:  Your Honor, just to respond

11  quickly, we produced the financial information that Ms. Kim's

12  referring to earlier this week.  Admittedly, it took us a while

13  to get it together for VMware.  So what Ms. Kim indicated is

14  missing is there.  It was provided.  If they have issues with

15  that, they can let us know and we can look into it.

16         They can also -- obviously, they haven't taken the

17  deposition yet of the financial person.  They can ask the

18  financial person about it.  And if they believe after that that

19  something is missing, they can come back to us and of course we

20  will work with them.

21         THE COURT:  Absolutely.  And if you have any issues

22  with that, you can come back to me, and I'm making a note of

23  the time on the record when we discussed this.  So if you need

24  to come back, I should be able to find it to refresh my

25  recollection.

1        Which reminds me before we move on to the next

2    issues, I'll remind Counsel within a week of us concluding

3    this, I would like a joint submitted order.  This one may be

4    pretty voluminous, but work out a joint submission of a

5    proposed order.  If you have disputes over what it is, just put

6    each party's position, send it to us in an editable form to my

7    law clerk, Mark Scott.  And we'll get the order entered into

8    the docket.

9        So that takes care of Exhibit 1.  I will tell you --

10   let's see, and that may take care of -- or not Exhibit 1 but

11   Issue 1.  That may take care of Issue 3, the interrogatory or

12   -- okay.  So it will be part and parcel of Issue 1.

13       I will tell you, everybody, that I'm going to give

14   you conflicting information.  The conflicting information is,

15   one, I'm going to give you as long as you need for us to hash

16   through these discovery disputes.  And I have a hard stop at

17   4:30.  But tomorrow some things happened that freed up most of

18   tomorrow.  So what we don't get done by 4:30 today, we'll

19   reconvene mid-morning tomorrow and we'll work through it

20   tomorrow.

21       All right.  So let's see, we've got Issue Number 2 is

22   substantial completion of document production before

23   depositions.  It seems like one that should be pretty easy to

24   work through.

25       Ms. Kim, would you like to speak to that?

1              MS. KIM:  Yes, Your Honor.  I just want to go back to

2    my second clarification point on Issue Number 1.  To the extent

3    that I'm able to go back -- since I haven't been able to do it

4    on the fly today -- to look at our claim charts to see if there

5    is a hardware requirement, can we set a timeline for me and my

6    team to go back and look and if there are claim elements that

7    require hardware, to provide that information to defendants so

8    that we can get the information we need to prove the

9    infringement?

10              THE COURT:  Well, I tell you what.  I suspect knowing

11   both your team and the lawyers that you're working with that

12   hopefully somebody could find that by tomorrow.  So if we

13   reconvene, I'm going to be really surprised if we get through

14   everything this afternoon, but I may be surprised.  But if you

15   can get that to defendants and to the Court by tomorrow, we'll

16   consider that in light of the ruling that I just made.

17              MS. KIM:  Thank you, Your Honor.

18              For Issue Number 2, I think it was -- like you said,

19   Your Honor, it's pretty self-explanatory here.  We just need to

20   get the documents as soon as we can.  As defendants have said

21   today, discovery allegedly was going to close last year.

22   Things got pushed back so that me and my team could come in and

23   step in.

24              And like I said earlier today, they only produced

25   some VMware financials as late as yesterday, so we hadn't had a

1  chance to take a look at those yet.  That accounts for four of

2  the eight cases.  Fact discovery closes on May 6th, so it's

3  just three weeks away.  And we haven't taken any of their

4  depositions, any 30(b)(6) depositions, any 30(b)(1) depositions

5  of any of their witnesses.

6          There's a lot to do in the next three weeks.  We need

7  to know that they have completed their document production so

8  that we can have time to analyze it and prepare for the, I

9  think, dozen or so depositions that we have to take over the

10 next three weeks, Your Honor.

11         THE COURT:  Have you -- do you have any depositions

12 on the schedule already?

13         MS. KIM:  We have our first one on Friday, Your

14 Honor.  There was supposed to be one today, but they -- this is

15 a different issue on our disputes given us designations early

16 enough so we can print the source code early enough for use of

17 depositions so that one got kicked.  But the first one now is

18 scheduled for Friday, the 15th --

19         THE COURT:  Okay.

20         MS. KIM:  -- Tax Day.

21         THE COURT:  Okay.

22         And so, Mr. Hershkowitz, do you have a date that you

23 can commit to having your -- I understand, you know, things get

24 found from time to time, but having document production

25 reasonably or complete as best you can.

1                MR. HERSHKOWITZ:  Judge, I think this was a

2     submission in search of a dispute.  In other words, we had

3     informed them that we were substantially done back in November

4     and had produced hundreds of thousands of pages.  We had

5     produced the code.  We had produced native files.  And there

6     was some things around the edges that were outstanding.  Our

7     production has increased by two percent when they asked us to

8     go back and look for information including in their, you know,

9     fourth submission that was by Mr. Siegmund on 4/7.

10                And in each case, we went back, we looked.  We have

11     been substantially complete since before the extension of the

12     schedule.  That's not to say when they asked us to go back we

13     haven't done a further search.  We have.

14                Some of what we've produced has to do with the fact

15     that there are IPRs and EPRs pending against a number of these

16     patents.  Some of it has to do with we had to produce updated

17     financial information.  Some of it had to do with they asked

18     for things.  We went back and we found a handful of additional

19     documents.  But we have been substantially complete.  That's

20     not in dispute.

21                THE COURT:  Okay.  And I will take you at your

22     representation as an officer of the Court that you're

23     substantially complete, understanding there's a fact deadline.

24                I will -- one bit of advice or one thing that I will

25     put out there so you can know my thoughts on this is I

1  understand that oftentimes when an individual gets deposed,

2  they'll show up sometimes and say, oh by the way, last night

3  thinking about this, I found this letter or this document in my

4  desk.  That happens.  I understand that.  I expect both parties

5  to understand that.

6          However, if you show up with a box of documents that

7  you could not possibly squeeze one more page into because of

8  it's full of single -- you know, double-sided single-spaced

9  documents, that's going to raise a question.  And if a

10 plaintiff or defendants needs more time as a result, you know,

11 feel free to reach out to the court if something like that

12 happens.

13          MR. HERSHKOWITZ:  Judge --

14          MS. KIM:  Your Honor, if I may quickly respond on

15 that point?

16          THE COURT:  Certainly.

17          MS. KIM:  Thank you, Your Honor.

18          We just need a commitment from defendants as to when

19 they will be complete in their document production.  VMware's

20 financials are what we would consider a pretty hot doc or a

21 critical document.  We didn't get that until yesterday.  We got

22 3,500 pages at the end of February.

23          We need a commitment from defendants either we do

24 have the documents and we will give them to you hopefully by,

25 you know, Thursday or Friday with their first deposition there

1  or we don't have them and confirming in writing that they don't

2  have them.  And this sort of goes into our very last dispute of

3  the chart, which I think you will probably end up hearing

4  tomorrow.

5          But we really request a commitment from them as to,

6  yes, we have them and we will give them to you or, no, we don't

7  have the document.

8          THE COURT:  Okay.

9          Let me ask you this, Mr. Hershkowitz.  As you sit

10 here, are Dell or VMware, do they have any pending production

11 that you know is coming out?

12         MR. HERSHKOWITZ:  Judge, none that I'm aware of.  You

13 know, we did the reasonable search back in, you know, last

14 year.  We made those productions.  When they asked us to go

15 back and revisit the well, we did.  Some additional things were

16 found.  You know, almost perfect shouldn't be the enemy of, you

17 know, seeking perfection.  We appreciate that.

18         But, you know, it's very interesting.  At a past

19 hearing before Judge Albright, he asked us to accept the

20 representations that were being made with respect to what

21 information exists or doesn't exist with respect to privilege.

22 And he said you should do that.  And yet, we're not being given

23 now the same courtesy.

24         I can say it again.  It is our understanding after

25 doing these searches and talking with the clients that we are

1   done.  That is not to say that if they ask a witness a question
2   that we've asked and so far if a witness had responded that in
3   fact there were additional documents, we've reviewed them.  If
4   they were relevant and not privileged, we produced them.

5         So I'm a little bit confused by Ms. Kim's again
6   constant, you know, harping on whether or not production is
7   substantially complete.  We told her repeatedly that it was.
8   And that is not to say there weren't some odds and ends and
9   including the financial stuff which we knew, and we said when
10  they raised in Mr. Siegmund's thing, which hopefully all those
11  are mooted.  We are not aware of anything for that latter
12  dispute that's still ripe.  We told them we would look into and
13  we would give it to them.  And that is exactly what we did.

14        THE COURT:  Okay.  So as I understand it then,
15  defendants -- Mr. Hershkowitz as he's represented -- document
16  production is complete.  And so we'll accept that.  I think
17  that moots Issue Number 2.

18        And as I said, Ms. Kim, it's a reasonableness thing
19  that you just have to evaluate.  If somebody comes in with one
20  or two new documents as a result of a witness being prepped,
21  that's common.  I understand that's common.  If you get a large
22  production at the last minute and you need more time with the
23  witness or you need to take a witness outside of the discovery
24  period as a result, you know, I would expect Mr. Hershkowitz to
25  accommodate.  And if he doesn't, you know, we'll help you in

1   that regard.

2           MS. KIM:  Thank you, Your Honor.

3           And this is with respect to source code, as well. I

4   understand that we still have some source code requests that

5   have not been loaded on to the review computers for our folks

6   to take a look at.

7           MR. HERSHKOWITZ:  So, Judge, if I could respond to

8   that --

9           THE COURT:  Okay.

10          MR. HERSHKOWITZ:  -- very (indiscernible), which is

11  the source code was available for months.  They basically

12  didn't look at it.  Then they started looking at it.  They've

13  made some requests.  Some of the requests it turned out they

14  just missed it, the code was there.  They've made a few others.

15  And we have been diligently providing that as it's been

16  requested.

17          Ms. Kim is absolutely correct.  I do understand that

18  there is one outstanding request that was recently made, and we

19  are looking for and are going to provide that code as soon as

20  we can get our hands on it, which my understanding is should be

21  shortly.  We're hoping for this week.  It may slip until the

22  beginning of next week.  But that is my understanding on that

23  one outstanding issue.

24          THE COURT:  Okay.  So you should have that additional

25  source code no later than next week.  If you run into an issue

1   or problem with that and you can't work it out, come back to

2   us.  And I understand source code review is a sticky wicket all

3   the way around.  So that's always a difficult one.

4          Okay.  Well, I am down to -- let's see, this looks

5   like defendants' Issue Number 1, WSOU's interrogatory

6   responses.

7          MR. HERSHKOWITZ:  Thank you, Your Honor.

8          For the record, Benjamin Hershkowitz.

9          So this really is a very narrow dispute, unlike the

10  disputes from Ms. Kim where she's asking, you know, sort of

11  broad categories and information and commitments.  Our issues

12  here are quite narrow.  There are certain interrogatories for

13  which we did not get robust responses.  Despite not getting

14  those robust responses, we've narrowed that to what we believe

15  is sort of front and center and critical to receive as

16  responses.

17         And it goes to a number of the interrogatories.  And

18  so what I'll do is I'll take them in turn, although I may group

19  them a little bit differently than is on there just in the

20  interest of time.

21         So the first here is Interrogatory Numbers 1 and 18.

22  And the interrogatories are basically when did they first

23  become of infringement and effectively through what means.  Now

24  they've -- the reason we want this is we only want the facts.

25  We're not looking for privileged information.  We just want the

43

1 facts when did it and how.

2        And the reason we want to know this is there were
3 interactions between the parties prior to the lawsuit.
4 Plaintiff had a licensing agent called AQUA who had reached out
5 in 2017, reached out again in 2018.  And we'd like to know did
6 they believe at that time that Dell was infringing.  Did they
7 believe?  Like when did they first become aware of infringement
8 and as to what patents.

9        They've asserted, as I mentioned, 12 patents, 8 of
10 which are focused on Dell.  And yet, they bought portfolios of
11 nearly 10,000 patent assets.  And so they made a specific offer
12 to Dell in 2018, Judge which, while more than Dell was willing
13 to pay, was not a tremendous amount.  It was $2-1/2 million.
14 And I could say that because there was no restrictions, no NDA
15 in place or anything else.  So I'm not divulging, you know,
16 confidential information.  And yet, that was for a portfolio of
17 10,000 patents.

18        I have no doubt that their position here is going to
19 be that each patent has been the greatest thing since the wheel
20 was invented, but we should be able to understand when did they
21 first become aware of this infringement.  And, also, you know,
22 the case is still ongoing.  And so while we haven't interposed
23 defenses of estoppel or waiver, it is relevant to those.  And
24 we can conform, obviously, the pleadings to match the facts of
25 what's going on here.

1          And so there's no pushback that this information is

2    absolutely relevant.  Their pushback has always been in the

3    context of that it's privileged.  But the identification of a

4    fact, what they believed was infringed, when they first learned

5    of the infringement by Dell or by VMware is I think absolutely

6    critical and could help put context on that offer.  It could

7    help put context on whether or not there was any waiver or

8    anything else by them.

9          And, also, it is relevant.  We have put at issue --

10   we made a motion to dismiss at the very beginning of the case

11   that there was no direct or indirect infringement.  The judge

12   ruled in our favor on indirect infringement but has kept direct

13   infringement under advisement.  But we moved from day one under

14   the belief that they did not perform an appropriate pre-filing

15   investigation.

16         We've written to them multiple times laying out in

17   detail why we don't think they performed an appropriate pre-

18   filing investigation and why we believe these cases are

19   frivolous.  And yet, they won't even give us the basic fact of

20   when did they believe we infringed and through what mechanisms.

21         For example, Judge, they purchased these patents from

22   Nokia.  Well, if Nokia's the one that told them, well, that

23   goes back because one of their arguments has been they don't

24   have to tell us that because they are not sitting on the

25   opposite side of the hypothetical negotiation, that Nokia will

1  be sitting on the -- or various Nokia entities -- on the

2  opposite side of that.  But if Nokia told them, well, that is a

3  data point we're entitled to.

4          And as we all know, Judge, privilege does not attach

5  to the sale of assets.  It attaches to the sale of companies,

6  but this was an asset sale.  So there's no privilege on that

7  communication with Nokia.  And there's no privilege as to a

8  fact as to when they knew about our alleged infringement and

9  through what mechanism.

10          So, Judge, that's the issue with respect to those two

11  which is Numbers 1 and 18.  My hope, Judge, is the next one

12  which is Interrogatory Number 3, I'm hoping is moot.  And the

13  reason is for Interrogatory Number 3, if you look at the end of

14  the dispute chart, plaintiff told us is they would supplement.

15  They told us this back when this was submitted on 3/29.

16          But while we have made repeated supplementations, we

17  supplemented our initial disclosures, we supplemented

18  interrogatories, and we supplemented production.  While we've

19  done this supplementation, we still have not received a

20  supplementation from WSOU on Interrogatory Number 3 which is

21  just telling us the earliest date other than what's on the face

22  of the patent that they are claiming priority to and where the

23  support is for that because, in some instances, there's

24  intervening art, for example.

25          So I'm hoping that what we can hear from Ms. Kim on

1  that one is that we will get it promptly, hopefully immediately

2  because this has been outstanding for months.  And they've

3  already agreed that they would provide it, but another two

4  weeks has gone by and we still don't have it.

5        So the next issue, Judge, is Interrogatory Number 6

6  which deals with the objective indicia of obviousness.  Again,

7  this falls in the same category as Interrogatory Number 3.

8  Plaintiff indicated that they would supplement, but they

9  haven't done so.

10       We just don't want to be in a position, Judge, where

11 after we are proving -- because some of the issues are

12 obviousness -- after we prove obviousness, they come back and

13 say no, Judge, there is no obviousness -- or jury, there is no

14 obviousness because of all of these secondary considerations

15 and the nexus.  If they have any facts, they should tell us

16 what those are now.

17       Now there's some noise that they raise about we

18 haven't done -- in their interrogatory response, we failed to

19 meet our burden to show any of the alleged prior art

20 combinations are invalidating.  Judge, every plaintiff and

21 patent owner in the history of time has made that exact

22 statement.  But that is simply not accurate and shouldn't be

23 basis for them to not provide us that information.

24       They've agreed to do it.  My hope is what we will

25 hear is that in fact they are doing it and doing it

1    immediately.  Like Ms. Kim keeps asking for a date certain,
2    Judge, we would like a date certain, you know, on this.
3            The next topic, Judge, is Interrogatory Number 13
4    And if you remember, Judge, I mentioned that they had a
5    licensing agent.  That licensing agent was AQUA.  We asked for
6    them to describe their relationship with that licensing agent.
7    They pointed to a patent monetization agreement using Rule
8    33(d) and nothing else.  But that doesn't fully answer the
9    question: Was AQUA authorized?  Did they -- were they
10   authorized to make the offers?
11           We have seen other documents indicating that there
12   was an NDA between AQUA and Nokia.  Was that authorized by
13   WSOU?  This goes also to bias and motive.  We're taking
14   depositions of AQUA.  We're entitled to know what exactly that
15   extent of that relationship is and what's going on.  And so
16   because of that -- because of those offers, the interaction
17   directly with Dell from plaintiff using the licensing agent
18   AQUA, we want that information.
19           Now to be clear, Judge, what we're not seeking is
20   documents.  There's no issue of burden here.  We simply want to
21   know the relationship between the two parties.  And so
22   hopefully, that's not a very high burden for them to be able to
23   meet.  And I think I've articulated why we believe this
24   information is rational and reasonable in the circumstances.
25           The next one, Judge, is Interrogatory Number 14,

1  which is to identify entities and describe relationships with
2  those entities where there's been financial support.  And,
3  again, it may be that they say there are none.  It may be that
4  they identify members of the plaintiff or parties, for example,
5  Mr. Shanus is we understand an independent consultant that is
6  working there.

7       This information is relevant for two reasons:
8  ownership -- well, three reasons: ownership, bias, and damages.
9  Now ownership's very interesting here, Judge, because HPE
10  brought a motion indicating that they did not believe that
11  there was proper standing in connection with different patents
12  but dealing with this same portfolio.  And as a matter of fact,
13  we've seen that there's the potential for three different
14  ownership issues.

15       Number one, this is not the first rodeo from the
16  principals, Mr. Etchegoyen and others, behind plaintiff here.
17  His last entity, Uniloc, a lot of cases had to be dismissed
18  because of a default on a loan which resulted in a divestiture
19  of complete ownership and, therefore, divested the court of
20  jurisdiction.  And that happened after a lot of litigation
21  across a lot of cases.  And so there's a little bit of
22  precedent here that there are these ownership issues.

23       Two is there's a suggestion that they might not have
24  had the right to sue for past infringement.  That goes directly
25  to damages.

1          And three is there are other issues that are wrapped

2    up in here with respect to bias to understand exactly who, you

3    know, is getting proceeds and information associated with that.

4          And so, again, we think it is absolutely reasonable

5    to get that information, you know, from us -- from them, excuse

6    me.

7          And, finally, Your Honor, the last two are Numbers 16

8    and 17 which is just asking for a description of its founding.

9    This is basic information.  There are two parties to a lawsuit.

10   We are entitled to understand how they're going to characterize

11   and present themselves before this jury.

12         They are taking the position it's not relevant

13   because they were not a party to the hypothetical negotiation

14   which would have been back with, as i mentioned, the Nokia

15   entities.  But don't you think we're entitled to at least basic

16   information about why -- who they are, what they were set up

17   for, what exactly their mission, purpose, and everything else

18   is, so that we are able to prepare ourselves for trial to

19   understand what themes that they might try to put up.

20         And interestingly, they asked 30(b)(6) topics on very

21   similar things: the identity, organization, and structure of

22   Dell and VMware, Dell and VMware's business and financial

23   relationships.  They also asked about, you know, policies and

24   practices regarding licensing.  And yet, they don't want to

25   give us that information in response to an interrogatory

1 response.

2 　　　　　So, Judge, I know that's a lot.  Let me pause and see

3 if you have any questions before giving Ms. Kim a chance to

4 respond.

5 　　　　　THE COURT:  I don't think I have any questions at

6 this point.  Let me hear from Ms. Kim.  I guess it's Ms. Kim on

7 this one?

8 　　　　　MS. KIM:  Yes, it is, Your Honor.  For now you still

9 have me for a bit.

10 　　　　　Heather Kim on behalf of plaintiff from Kasowitz

11 Benson & Torres.

12 　　　　　I'll just take these up one by one, Your Honor, if

13 that's okay with you.

14 　　　　　THE COURT:  That sounds good.

15 　　　　　MS. KIM:  For Rogs Number 1 and 18, which are pretty

16 similar, I will just -- I see that you have our briefing, as

17 well.  Judge Albright has already ruled on this at least twice

18 that I'm aware of, once at the March 11th (indiscernible) and

19 then another time at a recent March 21st hearing with respect

20 to subpoenas that Dell and other defendants have served to

21 AQUA, Basepoint, and some other third-party entities.

22 　　　　　The information that defendants are asking here are I

23 think -- I took some rough notes -- about AQUA and our -- about

24 AQUA.  So in AQUA, the Court already denied discovery into AQUA

25 because the negotiations that happened before a consummated

1  license are not discoverable as we argued at that hearing and

2  Judge Albright agreed.  It would have a chilling effect on

3  settlement negotiations if we were able to say what the

4  negotiations actually entail before you see the agreement.

5       The best, you know, sort of evidence of what the

6  parties agreed to would be within the four corners of the

7  actual licensing agreement that is being consummated.  We don't

8  see a reason to depart from what the judge has already ordered

9  at least twice that I'm aware of, and that would be at the

10  March 11 and March 21st hearings.

11       I think Mr. Hershkowitz also brought up how he wants

12  to know how we became aware of the infringement.  I think the

13  infringement themselves I think are set forth in the complaints

14  that we filed.  We also have put in preliminary and final

15  infringement contentions so they have that information.

16       Anything that would have been done with respect to

17  that as we told them before at the March 11th hearing, you

18  know, the EOU analysis, infringement analysis, that was done by

19  outside counsel.  That's privileged information.  And so the

20  judge there, I think -- this was at the March 11th hearing,

21  Judge Albright already said that the (indiscernible)

22  investigation, that stuff is out, it's not discoverable.

23       And contrary to Mr. Hershkowitz's statement, there is

24  no pending Rule 11 motion.  I understand that they had moved to

25  dismiss indirect infringement, which I believe the Court

1  indicated that it would be dismissing without prejudice.  But

2  that's not the same as a Rule 11 or a 285 motion, Your Honor.

3        I think the next interrogatory -- I'm just looking at

4  my rough notes here -- is Interrogatory Number 3 and Number 6.

5  As we told defendants, we will be supplementing those

6  interrogatories with the information requested.  We plan to do

7  that this week and at the latest within seven days from today.

8  So they will have those by next Wednesday.

9        The next interrogatory, I believe, that was covered

10 is Number 13.  This has to do with Brazos' relationship with

11 AQUA.  The entirety of the relationship between the two parties

12 is set forth in a six-page agreement that sets forth the date,

13 the term, the fees associated with it, what AQUA was hired to

14 do by Brazos, what it was engaged to do.  All of that is in

15 there.

16        With respect to requiring a narrative response and us

17 trying to summarize what the agreement says, I think, would not

18 be as fulsome and correct as the agreement itself, which is why

19 we answered pursuant to Rule 33(d).

20        With respect to any other communications that

21 defendants are looking into between AQUA and Brazos, to the

22 extent there were any, those would have been negotiations that

23 AQUA may have been putting out there with the other parties to

24 be licensed.  And Judge Albright already ordered that

25 negotiations are not discoverable, so there's nothing else to

1 be left there other than the agreement that we're standing on.

2          For Interrogatory Number 14, this has to do with how

3 Brazos is funded.  Judge Albright has already also denied

4 discovery into the very same information that's being sought

5 here.  This has to do with Dell's among other defendants, I

6 believe -- those are Google, Microsoft, HPE, ZTE, among others

7 -- into their subpoenas to AQUA as well as Basepoint.

8          As Mr. Hershkowitz indicated, they are scheduled, I

9 believe, to depose AQUA I think at the end of this month on the

10 28th rings a bell for me.  At that time, they can ask for what

11 relationship is there, I think.

12          But with respect to funding, how we're funded has

13 nothing to do with anything in the case.  As Judge Albright has

14 already ordered, as well, the funding also has nothing to do

15 with the case, so he denied the subpoenas that were served by

16 defendants here.

17          You know, in my mind it's tantamount to us asking who

18 Dell and VM's, to the extent they're a public company, who

19 their stockholders are.  Why would that matter?  It just

20 doesn't matter to any claim or defense in this case.

21          And then I think the last category here, Your Honor,

22 is Number 16 to 17, which has to do with our founding mission

23 statement and purpose.  The operating agreement which we have

24 produced to defendants -- I think there have been a couple of

25 versions of that which I know that they have -- it actually on

1  the first page of the original operating agreement states what

2  the character of the business is.  I won't say what it is since

3  we are in a public hearing, and that document is highly

4  confidential, and I understand that we have some client

5  representatives on the call today.

6          The operating agreement does state what the mission

7  -- what the founding purpose is.  It actually has a paragraph

8  called "Character of the Business" which sets that forth.  It

9  also -- we had told them, as we say in our response here, that

10 there is a website called Brazoslicensing.com which goes in

11 pretty, you know, good detail as to what we're about, what we

12 do, what our mission purpose is, who's part of it, where we're

13 located.  All of that information is there.

14         So like Interrogatory Number 13, we referred

15 defendants to the documents as well as the website which is

16 going to do a much better job of stating the information that

17 they're asking for than me going in and trying to paraphrase

18 all of that, Your Honor.

19         And I think --

20         THE COURT:  Let me interrupt you just --

21         MS. KIM:  Mm hmm.

22         THE COURT:  -- I'm sorry -- real quick for the sake

23 of the record.  You said the -- can you give us the name of the

24 website again?

25         MS. KIM:  Sure.  It's Brazoslicensing.com.

1           THE COURT:  Okay.  Brazos Licensing.  Got it.  Sorry.

2           MS. KIM:  Yes, Your Honor.

3           THE COURT:  Go ahead.

4           MS. KIM:  I think that was all the interrogatories

5  that were (indiscernible).

6           THE COURT:  Okay.

7           MS. KIM:  Unless you have any questions from me.

8           THE COURT:  Well, just to make sure I understand.  So

9  basically, the position is that with regard to -- plaintiff's

10 position with regard to Interrogatories 3, 6, 16, and 17, they

11 either have been supplemented or will be supplemented within a

12 week in such a way to moot the dispute to answer the questions

13 and solve the defendants' concerns?

14          MS. KIM:  Just Interrogatory Numbers 3 and 6, Your

15 Honor --

16          THE COURT:  Just 3 and 6?

17          MS. KIM:  -- would be supplemented.

18          THE COURT:  Okay.

19          MS. KIM:  Yes, Your Honor.

20          We're also going to supplement Number 16 and 17, Your

21 Honor, to refer to those documents as a formality.

22          THE COURT:  Okay.  To refer to the previously

23 produced documents?

24          MS. KIM:  Correct.  And Brazoslicensing.com

25          THE COURT:  Got it.  Got it.

1          Okay.  Would you like to respond, Mr. Hershkowitz?

2          MR. HERSHKOWITZ:  As I'm sure you can guess, the

3   answer is yes, but I will be brief.

4          THE COURT:  Okay.

5          MR. HERSHKOWITZ:  Hopefully, I will now honor that

6   promise.

7          So, Judge, I'm glad to hear 3 and 6.  Obviously, we

8   accept Ms. Kim's representation that we will have that by next

9   week, so it's nice to take that one off the table.

10         With respect to 1 and 18, to some extent it was

11  presented as a little bit of a non sequitur, in my opinion, by

12  Ms. Kim.  The issue is not going into their various

13  communications with third parties.  We're not seeking the

14  communications with the third parties.  We're just seeking some

15  basic facts, not the why, just the when and the who.  When did

16  they learn and who did they learn it from?

17         We're not asking for a deep detailed discussion.  If

18  they want to then say that they -- well, let me take that back.

19  So all we're really looking for is that basic information.

20  With respect to Rule 11, Judge, they're right.  There's not a

21  Rule 11 motion pending yet.  And hopefully, we will not have to

22  get to that place.

23         However, it's unequivocally clear that we do believe

24  that they did not have a basis for bringing these lawsuits.

25  And we've told them that repeatedly in letters and otherwise.

1 So we just don't want to hear that there's some exonerating

2 information.  You can't use privilege as both a sword and a

3 shield.  They're using it as a shield here.  I don't want them

4 then using it later.  So either we should be entitled to get

5 this very basic information to put context on important issues

6 in the case including the outreach and interactions directly

7 between the parties or not.

8          3 and 6 we've taken off the table.

9          You know, Number 13, the six-page agreement which Ms.

10 Kim referred to, yes, there is a six-page agreement.  And this

11 is supposed to describe their relationship with AQUA.  Here's

12 the data point, though, Judge.  Our understanding is that that

13 agreement is dated after when we had the first outreach by

14 AQUA.  So either there is another agreement that exists -- we

15 don't know -- or there was some other type of understanding

16 between the parties.

17          All we're asking for is to understand that

18 relationship that they've had with AQUA.  I don't think that's

19 an unreasonable request.

20          With respect to Number 14, which is information

21 regarding the entities that financial supported, Ms. Kim says

22 it bears no relevance to any issue.  Judge, as I indicated, it

23 does bear direct relationship to multiple issues including

24 ownership which goes to the standing of the Court.

25          Either they have standing or they don't have standing

1  or they had standing and they've potentially lost standing.

2  But we're entitled to know that.  We're entitled to be able to

3  challenge and understand whether or not there's appropriate

4  standing for these patents.  And it doesn't seem to be a large

5  burden for them to be able to provide that information to us.

6          With respect to Numbers -- why my handwriting is not

7  quite as large as I had hoped it would be.  With respect to

8  Numbers 16 and 17 regarding its founding, again, you know, they

9  sort of don't -- are not disputing that they've asked us for

10 similar information.  And so I don't understand what the

11 problem is about providing us with a narrative response other

12 than just generic cites to a website or a document because

13 we're entitled to understand what their theme is going to be at

14 trial.

15         And if they're going to limit that -- what they say

16 about their company, what they say about what they do -- to

17 specifically what is contained in those couple of spots, that's

18 a different story, Judge, or may be a different story.  But

19 that's not what I'm hearing them say right now.

20         Thank you.

21         THE COURT:  Okay.  All right.  Let's go off the

22 record just briefly.  I promise I'll make this quick.

23    (Off-the-record bench conference between Court and Law

24 Clerk from 3:50 p.m. to 3:52 p.m.)

25         THE COURT:  Okay.  We're back on the record.

1         Here's how we're going to rule with regard to
2    Interrogatories Number 1 and 18.  I am going to deny
3    defendants' request and I'll tell you at least my view so you
4    can understand it.

5         As I understand it, there's been no assertion of a
6    laches or estoppel defense in any parties' answers.  So those
7    really aren't at issue.  And, additionally, in my view, a
8    determination of or a decision of infringement involves both
9    legal and factual analyses.  So asking the question when did
10   you learn of infringement I think does start to touch on
11   attorney-client and work-product privileges.

12        Number 13, the patent monetization agreement, I
13   believe Ms. Kim represented that that document contains the
14   entirety of the agreement.  I'll take her at her
15   representation.  I'm going to deny that request.

16        I will say that in deposition if you need some
17   clarity because of the dates, as Mr. Hershkowitz mentioned, I
18   think that's fair game for some clarity during a deposition of
19   a corporate representative is did you have any interest in the
20   patents during the initial outreach by AQUA, when did you
21   establish a relationship with AQUA, does this document
22   encompass that relationship, et cetera.

23        As far as the back and forth and the underlying
24   communications and negotiations between AQUA and Brazos or
25   WSOU, I think those are going to be irrelevant to the issues in

1  the case.

2          Interrogatory Number 14, I'm going to deny that

3  request.  As I understand it, how Brazos is funded, who

4  investors are, et cetera, I don't believe that's relevant to

5  the case.  However, when defendants depose a corporate

6  representative or employees of WSOU or Brazos, they're of

7  course entitled to get into issues that may affect the

8  credibility of those specific witnesses and can inquire about

9  those -- that specific witness's compensation or how that

10 witness might stand to profit as a result of the lawsuit.

11         And then Number 16, 17, I think Ms. Kim's offer to

12 supplement with the -- or to identify the operating agreement,

13 point to the website, I think that is -- I'm going to deny the

14 request because I think her supplementation is going to be

15 sufficient for purposes of an interrogatory.  I do believe Mr.

16 Hershkowitz or whichever of his colleague deposes the corporate

17 rep of WSOU or Brazos can inquire about those things and get an

18 understanding as to what WSOU says.

19         And then, obviously, if we get down to trial and WSOU

20 starts -- wants to start a trial theme about how -- who they're

21 funded by or how they were set up to save the world by specific

22 funders or something like that, they can open the door.  And

23 when that happens, of course, then it will be fair game.  So

24 it's really up to WSOU to make sure that remains irrelevant.

25         And then Interrogatories Number 3 and 6, I believe

those will be supplemented by next week, and so that should

render it moot.  If they're not, Mr. Hershkowitz, please come

back and bring it to my attention and we'll take care of it at

that time.

MR. HERSHKOWITZ:  Thank you, Your Honor.

THE COURT:  And now we've got -- I think that brings

us to the end of what I have as Chart Number 1.  And so we can

move --

MR. HERSHKOWITZ:  (Indiscernible).

THE COURT:  Okay.  So we can move to Chart Number 2.

And the first point I have on here is concerns about WSOU's

response to -- oh snap.  I just -- hold on.  There we go.

WSOU's response to RFPs Numbers 89 and 91.

And I believe this is defendants' motion.  So Mr.

Hershkowitz, will you be addressing this?

MR. HERSHKOWITZ:  Yes, Your Honor.

Just very briefly, because I think we -- this may be

the last actual dispute.  I believe everything else after this

largely should be mooted based on our production, et cetera.

So hopefully we can get through this one quick and then Ms. Kim

can tell us whether or not some of these other issues are

mooted.

So there are two RFPs, Number 89 and Number 91.  And

what we are really asking for are the documents and making sure

we have a full set of documents.  In other words, all documents

1   that they served and exchanged in related patent litigations.

2   What they did was they brought a series of patent litigations

3   against a number of defendants.  And none of the patents

4   overlap, so I want to be clear right off the bat on that.

5   However, they're all coming out of the same portfolios.

6          WSOU has taken the position already that they really

7   have no technical knowledge, right.  They're a shell.  They

8   bought assets.  Everything's privileged.  The only thing that

9   they really have is their documents that go to, you know,

10  financial and other issues.

11         And in the very -- one of the very hearings that Ms.

12  Kim mentioned which dealt with third party AQUA, they actually

13  went on the record and said that similar patent infringement

14  matters were brought against, you know, others and, therefore,

15  discovery against AQUA should be consolidated across all the

16  cases.  And so here we have an actual party.

17         All we want to make sure is that we're not getting

18  one set of documents here and someone else is getting something

19  that says something a little bit different based on some

20  bologna being sliced very very thin.  WSOU now argues the

21  information is sort of not relevant but acknowledged that it

22  was the same issues, the same third parties, the same

23  plaintiff, you know, that is -- that's involved.

24         And so there's no real burden here.  Their production

25  is fairly minor to begin with.  They've already produced those

1   documents in other places.  And similarly, what we're really

2   looking for are the deposition transcripts in the other cases.

3   Yes, we are deposing the same people.  But we've already found

4   in prior submissions that there are nuances that they've taken

5   in different matters that are different.

6          The one I'm referring to, Judge, is that they brought

7   one set of cases in Delaware against a different defendant and

8   there they submitted a declaration by Mr. Shanus saying that he

9   and Mr. Etchegoyen were the most knowledgeable about WSOU's

10  licensing practices.

11         Here when we made a motion for intra-district

12  transfer to Austin which is still pending, they had Matt Hogan,

13  a different person within the organization, make a declaration

14  and he said we're going to designate me, you know, with respect

15  to trial-related issues.  Now they have designated him for two

16  30(b)(6) topics: identity of job functions and office

17  locations; job titles, roles, and responsibilities.  In other

18  words, nothing of substance.

19         And so we just want to understand what they are

20  saying these same witnesses in other cases just to make sure we

21  don't have a Janus situation where there are multiple faces and

22  each one saying something different.

23         So really, our request boils down to just getting the

24  deposition transcripts for the very people that we are also

25  deposing to make sure that there's no inconsistent statements

1  which goes to voracity and a number of other issues, as well as

2  there were a number of hearing transcripts.  Ms. Kim has put

3  them at issue repeatedly.  Some of those we were a party to.

4  Some of them we were not.

5          And all we have is the dispute letter which they

6  attached and we have the ruling.  But we have none of the

7  information about what they said, how they characterized or may

8  have provided information.  All we want to do is have that so

9  that we make sure that we are getting the one story and there's

10  not multiple versions of it.

11          THE COURT:  All right.

12          Ms. Kim, would you like to respond to that?

13          MS. KIM:  Yes, Your Honor.

14          Heather Kim on behalf of plaintiffs.

15          Your Honor, Judge Albright already denied an

16  identical request. This is public, so I can actually share this

17  with you on my screen-share.  Let me -- which I want to note

18  that we did provide to defendants, as well.

19          Are you able to see my screen, Your Honor?  It should

20  be one of the exhibits that is included in that zip file for

21  you.

22          THE COURT:  I do.  This appears to be an email to

23  Jeffrey Gunnell (phonetic)?

24          MS. KIM:  Yes, Your Honor.  So this is an email from

25  HPE's counsel at Sidley Austin, and they had attached the next

1   exhibit that I'm showing here.  Did you see the switchover to

2   the chart?

3             THE COURT:  I do.

4             MS. KIM:  And they're asking for the same thing, the

5   deposition transcripts and exhibits for any depositions of our

6   witnesses from cases other than HPE.

7             If I go back to the other exhibit, Your Honor, this

8   was actually denied as you can see by the Court without even

9   having a hearing on it.  So we think that the Court should

10  follow what it's already ordered in HPE, which we told

11  defendants about, and deny it here.

12            I also want to note that with respect to other -- I

13  guess, anything else that they're trying to get that is similar

14  -- let me do a new share.  The Court also in cases against ZTE,

15  which we also provided to defendants, has already denied

16  discovery in sister cases.

17            You can see here this was an order that went in after

18  a March 3rd hearing that was in the ZTE cases which we provided

19  to defendants, Defendants' request for a court ordered filed on

20  the docket memorializing the December 6th email Court ordered

21  compelling plaintiff's production, A, responsive to ZTE's

22  (indiscernible) request for production and, two, from sister

23  W.D. Texas cases, is denied.  So all of this has already been

24  denied by the Court, Your Honor.

25            There is a couple of other points that Mr.

1  Hershkowitz brought up that I would like to address.  One of

2  them is a potential -- I don't know how to say this nicely --

3  lie or something about what Mr. Shanus and Mr. Etchegoyen know.

4  And (indiscernible) --

5          THE COURT:  We'll call it an inconsistency.

6          MS. KIM:  Inconsistency in Delaware.  As Mr.

7  Hershkowitz noted, Mr. Hogan is not designated on any licensing

8  topics in 30(b)(6) capacities.  We've designated Mr. Shanus and

9  Mr. Etchegoyen on those topics back in November of last year.

10 So there is not an inconsistency with respect to all of a

11 sudden somebody else being the most knowledgeable about

12 licensing.

13         I think that takes care of all of the arguments I

14 heard unless you have any questions from me, Your Honor.

15         THE COURT:  Yeah.  Could you put that ZTE order back

16 up just real quick?

17         MS. KIM:  Sure, Your Honor.

18         THE COURT:  I was trying to find it while we were

19 looking through here, and I --

20         MS. KIM:  Yeah.  There were a lot of exhibits.  It's

21 Exhibit 11, but I have it on my screen if you can see it.

22         THE COURT:  Okay.

23         MS. KIM:  I think it's this bullet here related

24 discovery requests including discovery objected to based on the

25 sealed ruling.

1          I'd like to note for Your Honor that some of the

2    transcripts including in the Microsoft cases are sealed, and so

3    we've only been able to provide to the extent they were

4    relevant -- and, you know, kind of explaining to defendants

5    that the Court has already denied the same discovery --

6    redacted versions of those transcripts, as well.

7          THE COURT:  Okay.  Let's go off the record just --

8    well, actually, stop.

9          Mr. Hershkowitz, would you like to respond?

10         MR. HERSHKOWITZ:  Yes, Your Honor.

11         So as to the HPE and ZTE, we're not parties to either

12   of those.  As to the HPE, those cases were dismissed so there

13   was never an opportunity where HPE could have gone back and

14   revisited that ruling.  We also do not have unredacted

15   transcripts from either.  That's part of the problem, to

16   understand exactly what was said.

17         With respect to the point that -- regarding Mr.

18   Etchegoyen and Mr. Shanus, I think the appropriate focus is

19   just to context.  In the context when they were trying to tie

20   themselves by calling themselves Brazos and tie themselves to

21   Waco, they put up Mr. Hogan and said he's our guy.  That's what

22   they said in opposition to our motions for intra-district

23   transfer.

24         And yet, when they were dealing with a similar issue

25   out in Delaware, they didn't say that.  They said Mr.

1  Etchegoyen and Mr. Shanus are our guys.  I'm not saying that
2  there's a direct statement that is inconsistent in there.  I'm
3  saying based on the context, there's inconsistencies.  And in
4  light of that, we should be able to test those inconsistencies.
5       I don't think it's a burden for them to simply
6  provide us with the deposition transcripts of these witnesses
7  from these cases, not from Uniloc or prior cases where they
8  were involved.  Just in connection with the WSOU cases.
9       THE COURT:  Okay.  Let's go off the record just real
10 quick.
11    (Off-the-record bench conference between Court and Law
12 Clerk from 4:05:09 p.m. to 4:05:49 p.m.)
13       THE COURT:  Okay.  We're back on the record.
14       And largely, based on my understanding that this is a
15 similar issue as a request that's been previously denied by
16 Judge Albright, I'm going to maintain consistency with that
17 denial.  I will point out that Mr. Hershkowitz has the
18 declarations and when the depositions of those individuals or
19 the corporate rep occur, I think those are fair game to ask
20 them about and to press them on or at trial, for that matter, I
21 suppose, if it's relevant.
22       Okay.  So next issue -- let me get back to my -- is
23 that going to resolve all of Chart 2 or --
24       MR. HERSHKOWITZ:  Correct, Your Honor.
25       THE COURT:  Okay.  So now Chart 3, and I'm just --

1  I'm flipping back and forth between charts and notes.  And I
2  believe on Chart 3, so do we still have a dispute with Chart 3?
3  It looked like it was just getting names of 30(b)(6) witnesses
4  timely, I suppose.
5          MS. KIM:  Yes, Your Honor.
6          The issue here is like we've talked about earlier
7  today, Your Honor, is that we have the close of fact discovery
8  coming up in three weeks.  We served our 30(b)(6) notices on
9  them in October and November of last year.  We served our
10 responses to their 30(b)(6) and provided all designations,
11 which have not changed, back in November -- November 19th, to
12 be exact, of last year.
13         Yet, we still have this moving target with respect to
14 their 30(b)(6) designees.  There are about a dozen witnesses we
15 have to depose.  They suggest in their chart that they will
16 provide that information seven days before the witness is
17 scheduled to be deposed.  But since then, Your Honor, a couple
18 including one that was supposed to happen today and one that's
19 happening on Friday, they haven't even given us those
20 designations seven days in advance, despite what they say in
21 the chart.
22         We just need to know to do our planning to make sure
23 that we take, you know, not a lot of time but we have the time
24 to prepare and we can keep the depositions concise.  We need to
25 know which witnesses are put up for which topics that they've

 1   agreed to give us designations on ASAP with the first

 2   deposition coming Friday.  This is really important for us to

 3   do our planning.

 4          THE COURT:  And, Mr. Hershkowitz, would you like to

 5   respond?

 6          MR. HERSHKOWITZ:  I can be brief.  I thought this

 7   issue was largely mooted.  And so the short answer is in a

 8   little bit of, it looks like I'll call it a pot calling the

 9   kettle black.

10          But let me just jump to the heart of it, is they had

11   identified 60-some-odd topics where we had agreed to provide a

12   witness.  My understanding now is that other than for less than

13   a handful of topics, all of them have been designated.  Some of

14   those topics, the difficulty is we're not sure there is anybody

15   that has knowledge in which case we'll tell them that in fact

16   there is no knowledge within the company, much like they've

17   told us on several instances.

18          And so my understanding is that we are significantly,

19   if not completely, done with the caveat I think there is one

20   topic as of right now outstanding for VMware and maybe a

21   handful outstanding for Dell where we're still trying to verify

22   if there is information and identify the right witnesses.

23   Otherwise, everything has been identified.

24          And just as to the little bit of the pot calling the

25   kettle black is we had offered these witnesses ages ago.  And

1   normally you offer the witnesses, you get the dates, and then
2   you speak with them, make sure you're getting the best
3   educated, knowledgeable witnesses and identifying them for the
4   topics.  But, unfortunately, they put off the depositions
5   several times.  And so that process didn't happen fully.  But
6   it now has, and we are, as I indicated, fully complete.  We're
7   not withholding anything back.  As soon as we have those last
8   few topics, we will provide them.

9           THE COURT:  And will you be able to provide those at
10  least seven days before the individuals are deposed?

11          MR. HERSHKOWITZ:  Our goal is that, Judge.  In a few
12  instances, it may be less.  But like I said, we're down to a
13  handful of topics, several of which overlap I believe with some
14  other topics.  So there shouldn't be any real burden.

15          But we are endeavoring as quickly as possible to get
16  out those last few topics.  We got out some yesterday.  We got
17  out some today before this call.  So we believe this issue is
18  effectively mooted.  You have a commitment from us to get those
19  topics out as soon as we are able.

20          THE COURT:  Okay.  So here's what I'll do unless you
21  need to reply, Ms. Kim?

22          MS. KIM:  No, Your Honor.  Thank you.

23          THE COURT:  So what I'll do is to the extent it needs
24  to be denied or granted, I'll go ahead and grant plaintiff's
25  request on the 30(b)(6) designations that defendant identify

1  the witnesses seven days or as reasonably ahead of the

2  deposition of the witness as possible.

3          And, also, with the understanding, Ms. Kim, that if

4  you get the identity of a witness at a late enough hour that

5  you feel you need additional time with the witness ir you're

6  going to have to push the deposition back, I'll assume or hope

7  that Defense Counsel works with you on that.  And if you run

8  into a problem with that where you get a name so close to the

9  date of the depo that you need more time and you can't agree on

10 it, come back here and then I'll have a little more concrete

11 issue to address.  And I can help you with that.

12         Of course -- and we can have the argument on the next

13 topic, but that's a, as they say, a gun that kicks as hard as

14 it shoots.  So it's going to apply the same to plaintiff as far

15 as your identification of 30(b)(6) witnesses and the defendants

16 getting names timely enough to take an adequate deposition.

17         MS. KIM:  Thank you, Your Honor.

18         Yes.  All of our designations have been static since

19 November, so defendants have all of that for ours.

20         THE COURT:  Okay.  Well, let's see.  I've got Issue

21 Number 2 on Chart 3 is WSOU's refusal to designate on certain

22 30(b)(6) topics.

23         MR. HERSHKOWITZ:  Thank you, Your Honor.

24         THE COURT:  Go ahead, Mr. Hershkowitz.

25         MR. HERSHKOWITZ:  I'll be, again, fairly brief here.

1      I believe this issue may be largely mooted by your
2 prior ruling with respect to what you just said with respect to
3 89 and 92, in other words, Issue 1 on Chart 2.  And, in effect,
4 what we were asking for is the same type of information that
5 you had just said we could get through deposition and ask
6 questions.  All we're asking is that they designate someone as
7 a corporate representative for it and not just in their
8 personal capacities.

9      We had the first deposition yesterday so, obviously,
10 after this chart was submitted.  And they did not instruct not
11 to answer with respect to questions that fall within these
12 categories.  So maybe this is a -- not really a dispute.  All
13 we're asking is that they designate it so that it's corporate
14 testimony and not just individual testimony.

15      Especially since while Mr. Shanus is acting general
16 counsel, for example, of plaintiff, he is not technically an
17 employee.  So I don't -- we just don't want any funny business
18 later on that them saying, oh, distancing themselves from
19 testimony.

20      So it should be fairly straightforward for them, and
21 we have no objection to them back-designating Mr. Shanus'
22 testimony as that 30(b)(6) testimony with respect to these
23 topics.

24           THE COURT:  Okay.

25           Do you need to respond, Ms. Kim?

1          MS. KIM:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MS. KIM:  I will just -- very brief, I promise.

4          For Number 33, Your Honor already ruled on this

5    issue.  They're asking for corporate testimony on who would get

6    a distribution from settlement funds or a jury award, for

7    example.  As Your Honor stated earlier today, they're welcome

8    to -- and we have already offered this to them -- to ask the

9    witness in their personal capacity what bias they would

10   potentially have if they were going to give, let's say, 100

11   percent or whatever the percentage may be.

12         But we don't think that's an appropriate topic for a

13   corporate witness to answer.  But to the extent it goes to

14   bias, they can ask the individual witnesses that.  And we

15   allowed that testimony to go forward yesterday, as well, Your

16   Honor.

17         THE COURT:  And --

18         MS. KIM:  Also -- mm hmm.

19         THE COURT:  Oh, go ahead.  Go ahead.

20         MS. KIM:  Go ahead, Your Honor.

21         THE COURT:  Oh, I was just going to say for -- by way

22   of clarification, I don't know that it really matters so much

23   whether it's designated as corporate testimony or individual

24   testimony.  But if a witness is testifying either in their

25   individual capacity on behalf of WSOU or as a corporate

1   representative on behalf of WSOU, then what that individual

2   stands to gain financially from the lawsuit, I think, is fair

3   game for cross.

4          On the other hand, what other people who are not

5   testifying and may have invested in WSOU stand to gain is no

6   more relevant than how much different shareholders of Dell

7   stand to gain if Dell has a good year or a bad year.

8          So that's what I meant earlier.  That witness's --

9   and when that witness testifies as a corporate representative,

10  their personal credibility is an issue and proper subject for

11  cross-examination.

12         MS. KIM:  Thank you, Your Honor.

13         I think that takes care of Number 33.

14         For Number 49, Your Honor, they're asking for

15  corporate testimony on our financials.  Judge Albright has

16  already ordered that financial information for Brazos is not

17  relevant because it is not -- because we are not a party to the

18  hypothetical negotiation.

19         I can actually share my screen on that again.  Let me

20  pull that one up.  It's the same ZTE order for one of them, and

21  I'll share a transcript with you next, Your Honor.

22         Here, as you can see, plaintiff's financial is here.

23  And if I go to a hearing transcript on this one, this is the

24  Court speaking at a March 3rd hearing.  The Court says, no,

25  they don't.  This is about the hypothetical negotiation and my

1  representation to the Court that in this case, ZTE case, we

2  would not be a party to the hypothetical negotiation.

3         The Court says here, they don't --

4         "Hypothetical negotiation took place on a date when

5          someone else owned them.  The negotiation would be

6          between a different party and you guys unless the law

7          has changed.  I mean I get the book of wisdom.  I

8          handled a little bit of damages in my time, maybe not

9          as well as you have.

10         "But I mean hypothetical negotiations between the

11         party that owned the patent, the alleged infringer,

12         and I have a representation from Ms. Kim that that's

13         not them.  What relevance do the financials have?

14         "Okay.  I'm going to deny a request for that."

15         So, similarly, here, Your Honor, Brazos' financials

16  are not relevant to anything because they're not a party to the

17  hypothetical negotiation.

18         And then I think one of the last ones -- because 50

19  is the same as 53 -- is going to be Number 51.  This goes back

20  to I think one of the -- maybe it was the second issue that we

21  took up in the dispute chart, related to our consideration and

22  strategy of our portfolio including consideration in cost and

23  timing of potential litigation, which we understand Your Honor

24  has denied.

25         THE COURT:  Okay.  And going through the individual

1  topics, as I said, individual witness's credibility is fair

2  game, but I agree that Topic 51, Topic 49, I'm going to deny

3  the request to depose somebody on those.

4          I believe you said Topics 33 and --

5          MR. HERSHKOWITZ:  50, Your Honor.

6          THE COURT:  -- 50.  Are those both taken care of with

7  a prior ruling or -- let me flip back here.

8          MS. KIM:  Yes, Your Honor.

9          50 goes to the funders again.  So it would just be 33

10 that we will be allowing defendants to depose our witness on

11 about what they stand to gain from the outcome of the

12 litigation.

13         THE COURT:  Right.  And that's -- again, that will be

14 witness-specific, not -- you know, to everybody that's invested

15 who's not swearing to tell the truth and sit before the jury or

16 the Court.

17         MR. HERSHKOWITZ:  So, Judge, just so I have clarity,

18 so we can ask all these witnesses questions in their personal

19 capacity, but it will not be considered to be corporate

20 testimony because, as I indicated yesterday, Mr. Shanus already

21 testified with respect to information within these topics.

22 And, you know, so we didn't think that there was that much

23 burden to making sure that it was designated as corporate.

24         But I just want to make sure that there's no

25 restrictions on us to continuing to ask questions of people in

1  their personal capacity.

2          THE COURT:  Yeah.  Definitely -- if I follow you

3  correctly, definitely in their personal capacity if it goes to

4  that witness's credibility and they need to tell you if WSOU is

5  paying them or not paying them.  If they're going to make

6  money, a jury's entitled to know and weigh the credibility of

7  the witnesses.

8          And just -- you know, when Dell witnesses testify,

9  what those witnesses are being paid by Dell even if it's a

10 salary and not contingent on the litigation, I think that's

11 fair game for credibility, too.

12          MR. HERSHKOWITZ:  Thank you, Judge.  I just want to

13 make one point which goes to you, you know, if you fire,

14 there's also the kickback on the gun.  They asked us very

15 similar things in their requests: For example, WSOU Topic 37,

16 defendants' return on investment which is related to, like, 49;

17 WSOU's Topic 48, requests Dell and VMware business and

18 financial relationships with third parties.

19          You know, so they've got these other questions and,

20 you know, they should be able to hold themselves up to a

21 mirror, you know, with respect to Topic 51 on their policies

22 dealing with monetization.  They ask us about a number of our

23 policies, too.

24          And so I just want to make sure because we said,

25 fine, we'll provide you with a witness.  You can ask them to

1  the extent it's not privileged information.  And yet, we don't
2  seem to be getting that same courtesy in return.  And so, you
3  know, I just wanted to point that out for the Court.
4          THE COURT:  Well, and I hear you.  I hear you loud
5  and clear.  That's not an issue that I think is necessarily
6  before the Court or I was prepared to address.  Off the top of
7  my head, I can see there being some slight variation in that
8  WSOU didn't own the patents at the time of the hypothetical
9  negotiation.  And those issues, as I understand it, might be
10 relevant to a damage analysis.  But if they become -- it
11 becomes a sticking point, definitely feel free to come back to
12 the Court.
13         MR. HERSHKOWITZ:  Thank you.
14         THE COURT:  Let's see, I think we've got one more
15 chart with a few more issues.  I've got about ten minutes.  Do
16 we want to dive into any of those or --
17         MS. KIM:  Your Honor, with that last chart, I believe
18 we can -- I think that has been mooted and we can withdraw I
19 think the last set of disputes that you're looking at.
20         But I did want to circle back to the reasonably
21 similar products issue.  I did get a few answers from my team
22 in the time that we've been at this hearing.  So there are -- I
23 can provide you some claims that do require the hardware, and I
24 can tell those to you right now if that would be preferable or
25 via email, whatever the Court would like.

1          THE COURT:  I tell you what, let's do it this way.
2    If you will, email me those to me, cc opposing counsel when you
3    do.  And then if need be, we can -- I hope we can maybe get
4    everybody to jump back on a quick Zoom tomorrow or that may be
5    sufficient for me to make a ruling based on the email.
6          Does that sound fine, Mr. Hershkowitz?
7          MR. HERSHKOWITZ:  Yes, Judge.
8          I was just going to say three things.  Sorry.
9          One is we'd like the opportunity, obviously, to
10   respond as to why whatever they're citing -- because we've gone
11   through these very carefully -- is absolutely irrelevant.  In
12   other words, the hardware is absolutely irrelevant, which seems
13   like you're doing.  We'd be perfectly content if it's easier
14   for Your Honor to simply do that in writing.
15         And the reason I'm suggesting that is you might not
16   be able to tell, I just had shoulder surgery last week, so I've
17   got a bunch of rehab and stuff tomorrow.  And so while I've
18   been fairly mobile and now I'm going to go ice this thing and
19   I've got some appointments tomorrow and I've been the one sort
20   of handling these issues.  But I can get somebody to cover if
21   that presents a challenge.
22         But we were just going to suggest maybe if we can
23   just do it through, you know, some very short writings.  They
24   can tell us why, and we can tell you why that dog don't hunt.
25   So --

1    THE COURT:  Yeah.  Let's do that.  I do have to

2 comment, Mr. Hershkowitz, I would have never guessed you'd

3 recently had surgery.  You look great.  I'm guessing it may be

4 your right arm because you're gesturing a lot with your left.

5 But --

6    MR. HERSHKOWITZ:  Let's just say it is the left arm,

7 but if I tried to move the shoulder as opposed to just the

8 elbow, you would see some wincing going on.  It's --

9    THE COURT:  I understand.  I understand.  Well, we

10 want to accommodate that to help you rehab that.  So let's do

11 that.  Let's follow the 500 words you can -- you know, 500-word

12 email to the Court with the charts attached.  If you can get

13 that to us let's say by noon tomorrow, and we'll get you an

14 answer after lunch tomorrow.

15    And then I will -- yeah, and the email, obviously, if

16 you double check your chat box, that's Mark Scott is the clerk

17 who's going to be handling this.  And for those of you who have

18 not yet met Mr. Scott, I would tell you he has six or seven

19 years of patent litigation experience under his belt.  So he is

20 extraordinarily helpful on this -- on these types of disputes.

21    The one other thing I will add -- and you can put

22 this in the draft order, Ms. Kim, that the parties will submit

23 -- is just from looking at these charts, it seems like there's

24 been a lot of back and forth.  I don't know that you'll need me

25 as often as you might have wanted in the past, but I will say

 1  that you can -- if during the depositions we have issues about

 2  whether a question crosses the line or not because some of

 3  these are sort of difficult lines to draw, please call my

 4  chambers.  They'll track me down.  I'll get you an answer as

 5  quickly as possibly so that it doesn't cause any issues with

 6  the proceedings, with the depositions.

 7          So at least for the sake of these cases for the WSOU

 8  v. Dell and Intel, use my chambers number as a hotline, if you

 9  will, while you're taking depositions.

10          MR. HERSHKOWITZ:  Thank you, Your Honor.

11          Judge, just one thing.  When can we expect -- can we

12  get a time certain because we don't want to get something at

13  11:00 tomorrow to put in our response with it being due at noon

14  Central.  So maybe if we can get a commitment to receive it

15  this evening, that will give us tomorrow to insert our section.

16          THE COURT:  Well, how about if -- Ms. Kim, what time

17  zone are you in?

18          MS. KIM:  I'm on -- I'm in California; Pacific.

19          THE COURT:  Okay.  You're in California.

20          And then, Mr. Hershkowitz?

21          MR. HERSHKOWITZ:  I am sitting in New York where we

22  have had repeated alarms after the tragedy of yesterday that

23  everybody's phone keeps going off.  So I hid my phones in a

24  different room today.  But I'm in Eastern.

25          THE COURT:  Well, I'm sorry.  Yeah, sorry to hear

1  about that.  And our hearts go out to y'all up there.  And then

2  we couldn't have picked people in two -- it worked so much

3  better if y'all were in the opposite time zones.

4          MR. HERSHKOWITZ:  I know it's -- I think it would --

5  Your Honor, it works well here because Ms. Kim is several hours

6  behind.  So she should have time today, and we can pick it up

7  tomorrow.

8          THE COURT:  Does that sound reasonable to you, Ms.

9  Kim?

10          MS. KIM:  Yes, Your Honor.

11          We will try our best to get things to them.  It's

12  2:30 here now.  We will get it to them today.

13          THE COURT:  Yeah.  If you can get it to them this

14  evening.

15          And then, Mr. Hershkowitz, add your section and get

16  it to the Court by noon, noon Central Time, so that would be

17  1:00 your time, I suppose.

18          MR. HERSHKOWITZ:  Understood.  Thank you, Your Honor.

19          THE COURT:  All right.  Anything else from

20  defendants?

21          MR. HERSHKOWITZ:  No, Your Honor.

22          THE COURT:  Anything else from the plaintiffs?

23          MS. KIM:  No, Your Honor.  Thank you for your time

24  today.

25          THE COURT:  All right.  Thank you all very much.

84

1          UNIDENTIFIED SPEAKER:  Thank you, Judge.

2          MR. HERSHKOWITZ:  Much appreciated.  Thank you, Your

3  Honor.

4       (Proceedings concluded at 4:26 p.m.)

5                         * * * * *

6

7

8

9

10

11

12

13

14

15              **C E R T I F I C A T I O N**

16          I, DIPTI PATEL, court approved transcriber, certify

17  that the foregoing is a correct transcript from the official

18  electronic sound recording of the proceedings in the above-

19  entitled matter, and to the best of my ability.

20

21  /s/ Dipti Patel

22  DIPTI PATEL, CET-997

23  LIBERTY TRANSCRIPTS          DATE: May 11, 2022

24

25